**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | | |
|---|---|---|
| **JANET BURROWS** | * | **CIVIL ACTION NO. 13-0022** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

**REPORT AND RECOMMENDATION**

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The District Court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

**Background & Procedural History**

On May 26, 2010, Janet Burrows protectively filed the instant application for Title II Disability Insurance Benefits. (Tr. 75, 130-132). She alleged disability as of February 22, 2009, because of Raynaud's Syndrome, Undifferentiated Connective Tissue Syndrome, arthritis, and rheumatoid arthritis. (Tr. 138, 145). The state agency denied the claim at the initial stage of the administrative process. (Tr. 86-90). Thereafter, Burrows requested and received a May 19, 2011, hearing, via video conference, before an ALJ. (Tr. 46-74). However, in a June 1, 2011, written decision, the ALJ determined that Burrows was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work as a marketing manager. (Tr. 5-15). Burrows petitioned the Appeals Council to

review the unfavorable decision. On November 5, 2012, however, the Appeals Council denied the request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On January 7, 2013, Burrows filed the instant complaint for review before this court. She contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

**Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

**Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program

throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

> (1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.
>
> (2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.
>
> (3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.
>
> (4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.
>
> (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make

an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## The ALJ's Findings

### I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period. (Tr. 10). At step two, he determined that she suffers from severe impairments of Raynaud's Phenomenon, degenerative disc disease of the lumbar spine, and degenerative joint disease of multiple joints. (Tr. 10).[1] He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 12).

### II. Residual Functional Capacity

The ALJ next determined that Burrows retained the residual functional capacity ("RFC")

[1] He further determined that Burrows' medically determinable impairments of obstructive sleep apnea, liver dysfunction, osteoporosis, GERD, kidney dysfunction, obesity, depression, and bipolar disease were non-severe. (Tr. 10-11).

to perform sedentary work,[2] except that she can but occasionally engage in manipulative activities like handling and fingering with her upper extremities, and no more than occasionally carry out postural maneuvers like climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 12).

**III. Step Four**

At step four, the ALJ employed a vocational expert to find that Burrows was able to return to her past relevant work as a marketing manager – as that job is generally performed in the national economy. (Tr. 15).[3]

## Analysis

**I. Residual Functional Capacity**

a) Chronology of Pertinent Medical Records

Burrows was hospitalized from June 24-25 2009, with complaints of swelling and shortness of breath. (Tr. 301-303). She had gained more than 30 pounds since March 2009. *Id.* She had 2-3+ edema of the lower extremities, with marked dyspnea upon exertion. *Id.* Upon discharge, she was diagnosed with generalized edema of questionable etiology, tachycardia,

---

[2] Sedentary work entails:

> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

[3] Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61)

shortness of breath with dyspnea upon exertion, mitral valve disease, obesity, liver dysfunction, acquired cyst of the kidney, diaphragmatic hernia, atrial fibrillation, diverticulosis of the colon, chest pain, headache, and positive ANA with need to rule out systemic lupus erythematosus. *Id.*.

On August 27, 2009, Burrows was seen by Jyothi Mallepalli, M.D., for an initial consultation. (Tr. 218-219). In connection with the visit, Burrows completed a questionnaire whereon she indicated that she could walk two miles without any difficulty. (Tr. 220). She described her pain as a 4/10, with moderate joint pain. *Id.*

Burrows complained to Mallepalli of pain in both hands and feet for the past two months, sometimes with pain in her knees, hips, elbows, and occasional pain in both wrists and shoulders. *Id.* Most days she felt like she had the flu. (Tr. 218-219). She complained of morning stiffness that lasted from one to two hours. *Id.* Prednisone helped her symptoms. *Id.* Rheumatic review of systems was unremarkable for unexplained fever, weight loss, sicca symptoms, oral ulcers, Raynaud's or kidney stones. *Id.* However, she had joint tenderness. *Id.* Mallepalli concluded that Burrows had polyarthritis that appeared to be steroid responsive. *Id.* Her ANA was negative. *Id.*

On September 10, 2009, Dr. Mallepalli noted that Burrows had some good days and some bad days. (Tr. 216). Burrows had morning stiffness for up to two hours. *Id.* She also complained of back pain, joint pain, and swelling. *Id.* In connection with the office visit, Burrows again completed a questionnaire stating that she could walk two miles, but only with much difficulty. (Tr. 217). Her joint pain was moderate and was a 5/10. *Id.*

At an October 8, 2009, visit with Dr. Mallepalli, Burrows reported mild morning stiffness that lasted for less than one hour. (Tr. 211-213). Her pain and swelling in her hands felt better with Methotrexate. *Id.* Burrows exhibited reduced grip strength and swollen fingers. *Id.*

Mallepalli diagnosed rheumatoid arthritis, and classified the disease as "low," with a good prognosis. *Id*.

As per protocol, Burrows completed a questionnaire in connection with her October 8, 2009, office visit. (Tr. 215). She indicated that she could have walked two miles with some difficulty. (Tr. 215). She also could have participated in recreational activities and sports if she wished. *Id*. She could lift a full cup or glass to her mouth without any difficulty. *Id*. She characterized her pain as a 2.5/10 over the past week. *Id*. On a 10 point scale, with 0 meaning *very well*, and 10 meaning very poor, Burrows assigned a score of 2.5 with regard to how her illness and health conditions affected her. (Tr. 215). She characterized her joint pain as no more than mild. (Tr. 215).

On October 16, 2009, Burrows saw David Burkett, M.D., with complaints of swelling in her hands and feet. (Tr. 227). A coronary CTA showed normal coronary artery calcium score, cardiac functional analysis, and coronary arteries to CTS scanning. (Tr. 266).

An October 23, 2009, sleep study indicated mild obstructive sleep apnea. (Tr. 260-261). It was recommended that Burrows follow up for CPAP titration study. *Id*. However, there is no evidence that she ever did.

Burrows returned to Dr. Burkett on November 19, 2009, with complaints of swelling in her hands. (Tr. 230). She returned to Dr. Burkett on December 9, 2009, with complaints of bilateral lower extremity swelling, and facial redness. (Tr. 233). On January 5, 2010, Burrows saw Dr. Burkett with complaints of hand twitching. (Tr. 236).

A February 18, 2010, rheumatoid factor screen was negative. (Tr. 358). X-rays of the joints were consistent with degenerative disc and joint disease. (Tr. 360).

On February 18, 2010, Burrows saw Robert Goodman, M.D., for an initial rheumatology

consultation. (Tr. 340-342). She described her symptoms to Dr. Goodman as joint pain in her fingers, toes and knees; facial rash; morning stiffness, plus anytime she sits for an extended period; and foot pain while walking. (Tr. 346-351). Nevertheless, she indicated that, most of the time, she functioned well, with her pain a 4/10. (Tr. 351). She reported that her symptoms were better than the previous summer. (Tr. 340-342). Upon examination, her range of motion in the cervical spine and back were 80 percent of normal. *Id*. Her shoulders, elbows, wrists, hands, knees, ankles, and feet were within normal limits. *Id*. Burrows diagnosed osteoarthritis and scattered tenderpoints, suggestive of arthralgias, but insufficient to diagnose fibromyalgia or rheumatoid arthritis. *Id*. He prescribed over the counter Tylenol, as needed, Tramadol for pain, and recommended that she avoid the cold. *Id*.

On March 19, 2010, Burrows indicated that she was functioning well since her last visit, with her pain a 2/10. (Tr. 339). Notes from her March 19, 2010, follow-up visit with Dr. Goodman indicate that Burrows returned with complaints mainly in her fingers and toes turning blue and feeling cold. (Tr. 335-336). Upon examination, there was faint cool discoloration of the fingers and toes. *Id*. Goodman diagnosed Raynaud's Phenomenon, moderate. *Id*.

On June 19, 2010, Burrows completed a form at Dr. Goodman's office in which she indicated that her feet hurt, her legs ached, and she suffered from joint pain and numbness. (Tr. 332).

On June 21, 2010, Burrows reported to Dr. Goodman that she had pain in her feet and legs. (Tr. 330). Upon examination, however, her upper and lower extremities were normal. *Id*. She also had a full range of motion in all of her joints. *Id*. Goodman told her to return in three months. *Id*.

On August 13, 2010, Burrows reported that her hands were stiffening real bad while

driving and writing. (Tr. 396). She further stated that her level of functioning was poor and that her pain was 5/10. *Id*.

On August 21, 2010, at the request of the state agency, Burrows underwent a physical examination administered by consultative physician, Ajay Ravi, M.D. (Tr. 361-365). She complained of autoimmune disorders including Raynaud's syndrome, undifferentiated connective tissue syndrome, and arthritis. *Id*. She reported that she had been diagnosed with rheumatoid arthritis and Raynaud's about one year earlier and placed on Methotrexate for about five months, but discontinued the medication because she could not tolerate it. *Id*. She also reported onset of depression three months earlier. *Id*. She stated that she could not hold or grip anything tightly. *Id*. However, she was independent with activities of daily living. *Id*. She denied, fever, chills, malaise, fatigue, and recent weight changes. *Id*. She also denied headaches, chest pain, palpitations, edema, dyspnea on exertion, shortness of breath at rest, and heat or cold intolerance. *Id*.

Upon examination, she exhibited no muscle asymmetry, atrophy, or involuntary movements. *Id*. There was no structural deformity, effusion, periarticular swelling, erythema, heat, or tenderness of any joint, except as otherwise mentioned. *Id*. She could not stand on tiptoes or heels or tandem walk. *Id*. She also had problems with bending forward. *Id*. However, she demonstrated 5/5 grip strength with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally. *Id*. She had good motor tone, 5/5 strength bilaterally in all muscle groups. *Id*. She also did not appear depressed or anxious. *Id*. She showed good insight and cognitive function. *Id*.

Dr. Ravi diagnosed depression, Raynaud's syndrome, rheumatoid arthritis, and undifferentiated connective tissue disorder all based on history and available medical reports. *Id*.

However, he did not observe specific clinical evidence of joint abnormalities or other limitations. *Id*. Therefore, based on the examination and objective evidence, he opined that she should be able to sit, walk, and/or stand for a full workday, lift/carry objects, hold a conversation, respond appropriately to questions, and carry out and remember instructions. *Id*.

On September 21, 2010, Burrows reported to Dr. Goodman's office that her level of functioning was poor and that her pain was a 4/10. (Tr. 391). She had concerns regarding weakness in her hands, feet, legs, and hips. *Id*. Upon examination, the joints in the top of her feet were tender and swollen. (Tr. 389-390).

On September 24, 2010, a non-examining agency physician, Johnny Craig, M.D., reviewed the record evidence and opined that Burrows was capable of performing light work, but needed to avoid exposure to extreme cold. (Tr. 82-83). On October 14, 2010, non-examining agency physician, Nancy Armstrong, M.D., concurred in the foregoing assessment. (Tr. 374-375). Non-examining agency psychologist, Julia Wood, Ph.D., reviewed the record on October 5, 2010, and agreed that Burrows' mental impairments were non-severe. (Tr. 373)

On December 21, 2010, Burrows reported to Dr. Goodman's office that her level of functioning was poor and that she was doing worse. (Tr. 386). She reported that she was stiff all day long. (Tr. 384-385). Upon examination, she exhibited tenderness in her joints. *Id*.

On January 20, 2011, Burrows told Dr. Goodman that she had additional stiffness and pain. (Tr. 382). Nonetheless, she indicated that she was functioning "okay," and her pain was a 3/10. *Id*.

On February 24, 2011, Burrows reported to Dr. Goodman that her level of functioning was poor and that her pain was a 6/10. (Tr. 409). She complained of aching pain in her feet and hands, with all day stiffness. (Tr. 376-378). Upon examination, Goodman noted tenderness in

her hands and feet. *Id*.

At her April 29, 2011, visit with Dr. Goodman, Burrows noted that she had "special paperwork" that needed to be completed. (Tr. 403).[4] She indicated that her level of functioning was poor, with her pain rated as a 5/10. *Id*. She complained of stiffness, falling, ears ringing, dizziness, dropping things, and weakness. *Id*. Upon examination, Goodman noted that Burrows' knuckles were tender and swollen. (Tr. 401-402).

On May 27, 2011, Burrows indicated that her level of functioning was poor and that her pain was a 3/10. (Tr. 398-400). Goodman documented some tenderness in her knuckles, knees, and feet. *Id*.

b) Discussion

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, Burrows' activities of daily living, the medical treatment history, and the findings of the consultative physician and the non-examining state agency physician(s). (Tr. 12-15). The ALJ observed that Burrows' impairments would cause significant limitations of function, such that it would reduce her ability to walk and stand to a total of two hours in an eight hour workday, as well as reduce her ability to manipulate and perform postural activities to occasional. *Id*. As for the medical opinion evidence, the ALJ gave "no weight" to Dr. Ravi's assessment because it contradicted Ravi's observations that Burrows had difficulties walking. *Id*. The ALJ accorded "some weight" to the opinions of the non-examining agency physicians, but noted that the evidence suggested that Burrows was slightly more limited than they indicated. *Id*.

Plaintiff raises two challenges to the ALJ's RFC. First, she argues that the ALJ rejected

---

[4] Plaintiff retained counsel the previous month, and the administrative hearing was scheduled for May 2011.

the opinions of her treating physicians without good cause. Indeed,

> “ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.” *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). **The treating physician's opinions, however, are far from conclusive. “[T]he ALJ has the sole responsibility for determining the claimant's disability status.**” *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> **Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony**. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In sum, the ALJ “is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.” *Id.*; see also 20 C.F.R. § 404.1527(c)(2) (“If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.”).

*Greenspan*, 38 F.3d at 237 (emphasis added).

The difficulty with Burrows’ argument, however, is that the record does not contain a medical source statement from any of Plaintiff’s treating physicians. In support of her argument, Burrows cites to excerpts from Dr. Goodman’s office visit notes wherein he purportedly assigned certain limitations of functioning. However, Goodman’s office visit notes are pre-printed forms that predominantly document the patient’s subjective complaints. The court does not discern where Dr. Goodman, or any other treating physician, endorsed any limitation of function.

Conversely, at one of Burrows’ final visits to Dr. Mallepalli in October 2009, Mallepalli diagnosed rheumatoid arthritis, and classified her disease as “low,” with a good prognosis. Similarly, at Burrows’ initial visit with Dr. Goodman in February 2010, he diagnosed

osteoarthritis and scattered tenderpoints, suggestive of arthralgias, but insufficient to diagnose fibromyalgia or rheumatoid arthritis. He only recommended that Burrows avoid the cold. In March 2010, Goodman diagnosed Burrows with moderate Raynaud's Phenomenon, but did not not limit Burrows' activities. In fact, even after the ALJ issued his decision, Plaintiff did not supplement the record before the Appeals Council with a medical source statement from Dr. Goodman.[5]

Plaintiff's second argument is that after the ALJ effectively rejected the opinion of the consultative physician, the remaining record does not provide substantial evidence to support an RFC for a reduced range of sedentary work. The court is not unsympathetic to this argument. Frequently, when *no* medical provider has issued an opinion or medical source opinion regarding the effects of a claimant's impairments, the omission requires reversal and remand. However, the absence of a medical source statement, "does not, in itself, make the record incomplete." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In such a situation, the court's inquiry properly "focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record." *Id*.

Here, in contrast, *all* three of the physicians who expressed an opinion regarding the effects of Plaintiff's impairments believed that she was capable of *at least* sedentary work. Although the two agency physicians determined that Burrows retained the ability to perform *light*

---

[5] While the ALJ has the duty to develop the record, the claimant still retains the burden of proof for the first four steps of the sequential evaluation process. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). In the absence of any contradictory opinions from Plaintiff's treating physicians, the opinions of the non-examining agency physicians (and Dr. Ravi) remain uncontroverted.

work (with the need to avoid exposure to extreme cold),[6] by so doing, they also effectively determined that she was capable of *sedentary* work. *See* 20 C.F.R. § 404.1567(b). Thus, at minimum, the findings by the state agency physicians provide substantial support for the ALJ's RFC.

Although the record arguably could support an RFC for a reduced range of *light* work, the ALJ adopted an RFC for a reduced range of *sedentary* work because he partially credited her complaints and implicitly recognized that autoimmune disorders progress over time. Indeed, because of the significant subjective component to autoimmune disorders, the claimant's credibility may prove particularly relevant. Of course, when assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. SSR 96-7p. The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ need not follow formalistic rules in his credibility assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

In this case, the ALJ determined that Plaintiff was partially credible. (Tr. 13). In so deciding, the ALJ noted the inconsistencies between her complaints and the objective findings of the physicians upon examination. *See* Tr. 13-14. The ALJ's discussion meets the requirements of 20 C.F.R. § 404.1529, and his decision to partially credit Plaintiff's allegations and thereby reduce her RFC to a reduced range of sedentary work is supported by substantial evidence. *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole

[6] Plaintiff's past relevant work as a marketing manager, as it is generally performed in the national economy, does not entail exposure to extreme temperatures. *See Dictionary of Occupational Titles Code* 189.117-014, 1991 WL 671485.

gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

**II. Step Four**

Aside from her challenge to the ALJ's residual functional capacity assessment, Plaintiff does not raise any error specific to the ALJ's step four analysis.

**Conclusion**

The Commissioner in this case was tasked with determining whether Plaintiff was disabled. In so doing, she considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence by no means was uniform and could have supported a different outcome. Such conflicts in the evidence, however, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).[7] That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine

[7] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id*. This exception is applicable here.

confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 9th day of January 2014.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE